## 5975.   EAGLE AND PHENIX MILLS v. MONCRIEF.

1. A charge to the jury which instructs them that the master is bound to exercise ordinary care to provide a safe place for the use of his servant, and which fails to qualify the word "safe" by the word "reasonably," is inaccurate. Where, however, the evidence of the negligence of the master in this particular is clear and convincing, the omission of the qualifying word is not reversible error.

(a) Where an instruction of the court to the jury is inaccurate or incomplete because of the omission of a qualifying word, which is supplied in a correct instruction on the same point in a subsequent part of the charge of the court, it can not in every such case be held that the first instruction was so misleading or confusing as to necessitate the grant of a new trial.

2. In a suit for damages to a child under fourteen years of age, employed in an occupation alleged and by some evidence shown to be dangerous, it is proper for the court to charge that a child under that age is not chargeable with contributory negligence, except where he fails to exercise the degree of care and diligence which his mental and physical capacity fits him for exercising, and that he is not to be considered to have assumed the risk of patent, obvious danger which it is not within his capacity to appreciate and avoid; that a master employing in a dangerous occupation a child of tender years owes to the child not only the duty of warning him of the dangers incident to such an employment, but also of taking such additional precaution against the child's forgetfulness of warnings (if he is of such mental condition as to require such warning), his incapacity to appreciate and understand the danger (if he is so incapacitated), and against any other natural childish tendencies, as will reasonably insure his safety.

3. There was no material variance between the allegations of the plaintiff's petition and the proof.

4. The court did not err in declining to give the jury the instructions requested.

5. The evidence sufficiently supported the verdict, and there was no error requiring the grant of a new trial.

DECIDED SEPTEMBER 9, 1915.

Action for damages; from city court of Columbus—Judge Tigner.   August 19, 1914.

*Henry R. Goetchius, William deL. Worsley, Battle & Hollis,* for plaintiff in error.

*T. T. Miller,* contra.

WADE, J.   Edward S. Moncrief, a minor, brought suit by his next friend against the Eagle and Phenix Mills, alleging that he had been injured and damaged by the defendant by reason of certain negligent acts set forth in his petition.   He alleged, that the

defendant was engaged in operating cotton-mills, and had installed machinery necessary for the manufacture of cotton fabrics; that it had installed and in operation in its mills certain machines known as "lap-winder" machines, employed for the purpose of winding, on bobbins, the strands of cotton after passing the same through the carding machines; that on the front end of these machines were certain horizontal circular steel or iron rollers, about 4 feet long and 12 or 14 inches in diameter, with fluted surfaces, and, by placing a bobbin between the rollers, the revolution of the rollers and the bobbin would wind the strand of cotton upon the bobbin; that the top roller which pressed down upon the bobbin resting between the two bottom rollers was so arranged as to move or be forced upward as the bobbin was filled with the cotton strands or "drawings," and by means of a lever the top roller could be raised to permit the removal of the bobbin, and was lowered by a fly-wheel attached to the machine and designed for that purpose. The plaintiff further alleged, that he was employed by the defendant in February, 1912, to work in its mills as a sweeper, and his duties as such were to sweep the floor of the spinning-room and to gather up empty bobbins from the floor and under the spoolers and place them in trucks; that he continued in the performance of this work until October 30, 1912, on which day he was directed by the defendant, at about 7 o'clock in the morning, to work at one of the above-mentioned lap-winder machines, and, in obedience to the orders of the defendant, he proceeded to run, handle, and operate the same; that under or near the machine that he was directed to operate, there had been placed an oil can "which was leaky, and the oil therefrom had leaked and covered or partially covered the floor in front of said machine near the point where the lever on said machine was located, and where plaintiff was required to stand for the purpose of operating the machine, and the presence of the oil had rendered it slippery and slick." The petition alleges that about 10 o'clock in the morning of October 30, 1912, while the plaintiff was in the discharge of his duties, it became necessary for him to raise the top roller by means of the lever aforesaid, and, as he reached over to seize the lever for that purpose, his feet slipped upon the greasy and slippery floor, and this caused him to fall, and in falling his left hand was thrown in and between the rollers of the machine,

and was seriously lacerated, bruised, and torn; that his index finger was cut entirely off near the palm of his hand, and his middle finger cut off near the first joint, and the end of the finger next to the little finger was cut, bruised, and lacerated, and the flesh and skin on the top of his hand torn and entirely mashed off; and that from all of these injuries the remaining fingers of his left hand were stiff, crooked, and disfigured, and his hand seriously and permanently disabled and injured. He further alleged, that at the time he received these injuries he was thirteen years of age, and had no experience in the control and operation of machinery, and particularly no experience in the operation of the machine by which he was injured, and this last fact was known to the defendant; that he was never instructed or warned by the defendant of the hazards and dangers incident to the operation of this machine, "or of the presence of the greasy condition of the floor, or the dangers and risks;" that he did not know of the greasy and slippery condition of the floor, and, "because of his youth and inexperience, was incapable of appreciating, comprehending, and understanding the dangers and hazards to which he was subjected, and, in the exercise of that degree of care and diligence which his mental and physical capacity fitted him for exercising, could not have known thereof." He specifically alleged that his injuries were caused by the oil, and the negligence of the defendant in failing to furnish him a safe place to do the work he was directed to do, and in failing to exercise due care and diligence in making "such inspection of the machine and place at which he was directed to work," in order to discover the dangers to which he was exposed, and in failing to warn him of the dangers that existed; that the defendant was further negligent in permitting oil to leak upon the floor in the neighborhood of the machine he was directed to operate and in exposing him to the dangers arising therefrom; and that the defendant was negligent in failing to warn him of the presence of this oil on the floor at or near said machine, and of the consequent dangers created thereby; and he averred that the defendant knew of the presence of the oil on the floor as charged and of the dangers arising to him therefrom, or should have known of the same, in the exercise of ordinary care and diligence, and that the negligence of the defendant in the particulars named above was the direct and proximate cause of the injuries he

suffered. There were also allegations as to the life-expectancy of the plaintiff, his earning capacity at the time he was injured, and as to the pain and suffering he had undergone on account of his injuries. Damages were claimed in the sum of $10,000. The defendant in its answer denied that the plaintiff was ever directed to work on the machine at which it was alleged he was injured, but admitted generally his allegations as to the nature of his duties. It denied also the allegations as to the presence of oil near the machine by which he was injured, and denied allegations as to the manner in which he was injured and the extent of his injuries.

At the trial of the case the allegations of the petition were supported by proof. It is unnecessary to review the evidence at length, but some salient points in it must be referred to. There was testimony that the plaintiff went to work in the defendant's mills in February, 1912, and was hurt on the 30th of October thereafter; that he was hired as a sweeper, but whenever the mill was "short of help" the sweeper would be put on some other job, wherever needed; as, for instance, oiling the machinery, which was "a dangerous job and a man's job;" that the lap-winder machine was simple and its operation could be easily learned in 3 or 4 days; that the plaintiff commenced working in the mill 4 or 5 years before his injury, and when he first commenced his duties were to sweep and pick up bobbins from the floor, but after he stayed there longer he tried to learn about machinery, and when directed to do any particular job would attempt to do it, but he had no regular job at the lap-winder machines. The plaintiff himself gave a full description of the lap-winder machines and explained how they were operated. He testified that Shavers, "the second boss," who had charge of him, directed him to assist another operator in running two lap-winder machines, but did not give him any instruction as to how to run the machines, or show him how to shift the belts thereon, or warn him of any danger in the machines. He said that at the time he got hurt he was attempting to put his foot on the lever to raise the upper roller on one of these two machines, in order to put a bobbin in; that there was an oil-can on the floor, "sitting right on the side of the lever," and oil was leaking therefrom, but of this he had no knowledge, and that when he sought to put his left foot on the lever, his foot slipped on the oil and threw his left hand in the machine;

from which the injury as described in the petition followed. He further testified, that this was the first time he had ever operated that machine, as his duties were to sweep and pick up bobbins, and that Shavers, his boss, had no reason to think he understood how to operate the machine, "and the foreman knew that [he] had never run that machine before;" that when Shavers told him to help Coggins, another boy, several years older, on the lap-winder machines, no instruction was given "with reference to the loose pulley and the tight pulley, or about stopping the machine when [he] went to put the bobbin in," that in the operation of the machine a bobbin could not be taken out or placed in the machine without shifting the belt from the tight pulley to the loose pulley; that neither Shavers nor any one else in the mill told him about the presence of the oil on the floor near the machine he was directed to operate, and that the foreman said to him, "When you get through getting your floors clean, every time you get your floors cleaned, go help and show Joe Coggins how to run it;" that he then told the foreman that he did not know much about running the machine, but the foreman "did not say nothing else," though no part of the machine had ever been explained to him, and he had never been told how to start it or how to stop it, or how to put the bobbin on; that he had not taken out a single bobbin the morning he was injured, but when he was hurt there were only two rollers or stands that had gone around the bobbin—"two laps." He said further, on cross-examination: "There was a piece of cotton broke in the lathe, and I wanted to fix it, and I went to put my foot on it to lift it up, so that I could get my hand in it, and my foot slipped. The top was already down. That cotton caught in there and had just the two laps on them, and I was fixing it in there with my hand. I was after raising the roller up, and I didn't accidentally touch it. I was going to touch it, and my foot slipped out from under me. I had to touch it for the purpose of raising it. I put my left foot, and not my right foot, on the pedal. I am sure of that. I had to do it. My right foot was over to the right of me then. My right foot was further over from the pedal. My left foot slipped. It did not slip off the pedal. I was just fixing to put it on the pedal. I had put my foot on, but hadn't mashed it, and I had my foot on the pedal. My foot slipped off the pedal. The oil caused me to

slip. The pedal was slick; it was the slick caused my foot to slip. I know my foot slipped off of the pedal." He testified further: "I don't hardly remember what foot I had on the pedal; I think it was my right foot;" that his foot "slipped on the pedal and then slipped on the floor," and that the pedal caused him to slip, that he knew he slipped on the floor, from the fact that "oil was down there, and when [he] got up the oil was all on [his] overalls. [His] foot went out from under [him] and [he] fell." On recross-examination he said that he slipped on the pedal and then slipped on the floor, and he stated positively that he had his *right* foot, and not his left foot, on the pedal, and that this foot "slipped off of the pedal and on to the floor;" that he did not see the oil-can near the machine before he fell, and was too badly hurt to think about it after he fell, but went back there about a week afterwards, and he saw the same oil-can in the same place, "and the oil all over the same floor;" that he fell on the floor and got oil on his overalls, falling on his right side. The plaintiff expressly denied that he had been instructed by Jenkins, the head man, or Shavers, his immediate boss, not to operate the machine by which he was injured on the day of the injury, or that, after being put to work at this machine, Shavers or Jenkins thereafter directed him to stop work on the day of his injury.

Coggins, the new operator, whom the plaintiff said he was directed to instruct, testified, that he went to work for the defendant the day before the plaintiff was hurt, and was put at a lap-winder machine, and the plaintiff came in to assist him the next morning, but he did not know whether the plaintiff was sent there or not; that he knew Shavers, who had employed him, and who came into the room the morning of the injury, while Moncrief was there working on the machine; that Shavers came two or three times; that an old man came in and showed him for about an hour, and then Moncrief came in and assisted him; that he had learned how to raise the upper roller, and when Moncrief was caught in the machine he himself mashed the pedal down and turned the wheel that raised the roller up to release him; that there was an oil-can by the machine "that leaked all over the floor—old can. It was under the machine he [Moncrief] was working. The oil came around the machine where he had to stand. It was all in there about the pedal. . . It was just a

round oil-can. The oil-can they used for greasing machinery is one of these little half-pint things that you have to press the bottom. That was the only kind they had around there. The oilcan was around there leaking. I knowed it then. . . This oilcan was pushed up under the machinery. The oil run all around there. You couldn't help but see it. The doors are open; it was right there near the door, the machinery was, but it was dark in there. The oil was kinder red oil. You would have to look down under the machine to see it, around the edges. It run out in the walk-way; you have to fill the can up everytime you want to use it. You could see it just by walking along there. I don't remember about us talking about the oil being on the floor. I run the machine while Ed swept. He was showing me on both of them. My age is seventeen. Ed didn't tell me he had never run one of these machines. I don't remember whether he told me he knew how to run it. He knew how to run it. Him and Charlie (the old man) together told me how to run it. Both of them were not there with me at the same time. He didn't know so very much; he knowed how to run it, was about all. He did teach me to run it. He told me about doffing it when the laps was full around the bobbin, and about starting it, and about operating the foot-pedal,—told me what that would do, told me about turning the wheel when you wanted to lower or raise the top roller, and about fixing the cotton if it got wrong—on the bobbin. He told me all he knew, and showed me how to do it,—did it himself and then showed me, and I did it. I worked on both machines with him,—both of them the day before and the day that he was hurt. I was an older boy than he was. I was the only one in there— me and him. . . I quit there in about a week. I got hurt on it. This machine, known as the lap-winder machine, is a dangerous machine to operate, because when you get up there you are liable to get your fingers caught, and the lap turns all the time and you get your fingers in the rollers."

Creech (another employee and a witness for the defendant) testified, that he did not see any oil around on the floor at the machine where the plaintiff was injured, though he was standing right where he would have stood to operate it, and said, "If there was any oil down there, I didn't see any;" that he had often seen the plaintiff in this room working with the machinery; that he himself

released the plaintiff from the machine after the injury, without any help from Coggins, who took no part in the matter; that he was familiar with the operation of the machine, and that to raise the roller the right foot of the operator would be to the right of the machine, and the left foot on the pedal beneath it; that the machine was a simple machine to operate, so far as he knew, and there was no danger in the operation of such a machine that he knew of—no more danger than in other cotton-mill machines, and no danger at all in this particular machine when it was running, unless one should stick his hand in between the rollers; that he was employed at the mill of the defendant as an oiler and fixer, and was still employed there, and when he saw the plaintiff on the day before the injury, he saw him with Joe Coggins, and the plaintiff had been sent in there to teach Joe Coggins how to run the machine; that Shavers or Jenkins, one or the other, sent the plaintiff there to instruct Coggins; that he did not notice any oil on the floor, but he did not look for any, and did not "see any oil-can sitting under the machine;" that he did not oil these particular machines at all, as the man that runs such machines oils them, and he did not know who was oiling these lap-winder machines at that time; that he had never himself run one of these machines, unless for perhaps a few minutes at a time, and that the machine was as safe for a boy to use or operate as any other cotton-mill machinery, so far as he knew, and was "as dangerous as any other cotton-mill machinery," he supposed.

Williams, a witness for the defendant, testified, that he paid no attention to the condition of the floor in front of the machine at the time the plaintiff was injured; that he himself, while operating a different machine, could run a lap-winder machine, as it was very easy to operate; "it is mighty dangerous, though, to catch your hands in the rollers where the drawings come up from the can." "You would operate that pedal with the right foot. Your left foot would be standing right along here somewhere. If you are going to start this machine right here [illustrating], you would put your right foot on the pedal. If you were going to turn the wheel, you would use your right foot. I have never run these machines a day in my life. I have helped out there. I have doffed them frequently. You would do it with either foot." This witness testified further that the back rollers were dangerous,

2

"very dangerous," and the front rollers also "very dangerous," if you happened to get your hand between them when the upper roller was let down; "and if you get your hand between the other rollers it will get mashed." He said also that generally a man was employed to operate such a machine, and that Coggins got hurt on this identical machine some mornings afterwards; that he had seen Shavers in and out of that room, and saw the plaintiff in the room the morning he got hurt; that Jenkins, the boss, and Shavers, the second boss, assigned the plaintiff his jobs and told him what to do, but Shavers generally directed him, as Shavers placed the "help," and they were subject to his orders.

Shavers testified, for the defendant, that the plaintiff had been working there a good while before the injury—some weeks, doing sweeping a part of the time, and other jobs as the occasion arose, and, under his permission or by the direction of his superior, Jenkins, the plaintiff had "run lap-winder machines;" that he knew Coggins, who was there at the time the plaintiff was hurt, and who came to work the day before; that he showed Coggins the machine and explained to him how it was operated, and the day Coggins went to work he instructed the plaintiff to stay with Coggins and show Coggins how to operate the machine; that he himself showed Coggins a while, and that afterwards the plaintiff went there by his direction, the day before the plaintiff was hurt; that on the day the plaintiff was hurt he did not send the plaintiff to that machine with Coggins, but told him not to go to that machine on that day; that his superior, Jenkins, came in that room and saw the plaintiff there, and himself told the plaintiff to stay out of the room and away from these machines; that he could not say whether the plaintiff was directly present with him and Jenkins at the time or not, "but he was in the room somewhere," and he issued instructions to the plaintiff after Jenkins spoke to him about the matter; that he did not put him to work on that machine that day, but did so the day before, and did not pass through that room several times the day the plaintiff was injured and see him working on that machine; that before the injury occurred he told the plaintiff to stay away from that machine; he could not tell how long it was before the injury,—"a half or three-quarters, or something like that;" that he could not say whether he gave the plaintiff any instructions about this machine;

the plaintiff had run such machines before that time and had run them for him; he could not say how long, and could not tell how many times before that he had put the plaintiff on the machines; that he could not tell who taught the plaintiff to run the machine; that he *guessed* he had instructed him about the danger of these machines, as he instructed all operators when he put them on machines; some one else may have taught him how; that he gave him warning about the machine and the dangers, the morning he told him to stay out of there, and this was the first warning he had given him; that he did not consider these machines any more dangerous than any others, though any machine in a cotton-mill is dangerous to some extent, and any of them would hurt you "if you get in them—they are all dangerous, that is as dangerous as any;" that "you put your foot on the pedal there, the lever; you don't put your left foot, it wouldn't be convenient." This witness said that he did not see any oil about this machine at the time of the injury, but he never looked for oil, nor did he see an oil-can sitting there in front of the machine; that the person who ran these machines was supposed to oil them, and Joe Coggins was at that time supposed to oil this particular machine; that he did not know where Coggins put his oil-can, nor could he say whether it was a leaky can or not.

The foreman, Jenkins, testified, that about seven o'clock in the morning he saw Moncrief in the room where he was injured, and told him to get out of there and stay out of there, and the plaintiff then left; that he went to another room and later came back and found Moncrief again in this room, and told him to "get out of there and stay out," or otherwise he would discharge him; that when he saw him the second time it was about eight o'clock a. m., and the plaintiff was between the lap-winder machine and the door, and he approached the plaintiff and put his hands on his shoulders and told him to stay out of that room, and the plaintiff said nothing, but went out; that he did not see any oil on the floor in front of the machine when he went to the place where the plaintiff was hurt; that he never saw this boy working on these machines before that morning, as his duty was to sweep and pick up bobbins, and he did not recall whether Shavers hired the plaintiff or who hired him, and he did not know whether Shavers put the plaintiff to work on this machine the day before or not; that

the plaintiff had had no experience about running such machines, or warning of any danger, so far as he knew; that the defendant had an oiler to oil these machines, the man who runs these two lap-winder machines does his own oiling; that he did not know who instructed Coggins how to run or operate these machines; that Coggins had no experience before in running them, and he turned him over to the second hand (Shavers), and did not know who was directed by the second hand to instruct him; that it would take only about fifteen minutes to learn how to run a lap-winder machine, as the operator would only have to learn how to start and stop the machine, and the machine was the simplest one in the mill, with no particular danger about it, though it was dangerous if you stuck your fingers between the rollers; that so far as he knew, the plaintiff had no instructions from anybody as to how to run this machine.

The defendant then closed, and the plaintiff was recalled and testified, that Shavers did not give him any instructions not to go into the room on the day he was hurt, and that Jenkins did not give him any instructions that morning or at any time where to work, or tell him that morning to stay out of the room where he was injured; and that he did not see Creech there when Coggins released his hand. Coggins was recalled and testified, that he did not remember whether Shavers came into the room where the plaintiff got hurt on the morning of the injury or not, but Shavers came in the day before that; that he did not know whether Shavers on the morning of the injury gave the plaintiff any instruction to stay out of the room; that he did not hear Jenkins give the plaintiff such an instruction on that morning, and did not remember whether Jenkins came into the room during that morning; that he released the plaintiff's hand from the machine that caused the injury, and Creech assisted him.

The verdict was in favor of the plaintiff, and the defendant made a motion for a new trial, which was overruled, and it excepted.

It is clear from the preceding statement as to the pleadings, and the statement to the effect that there was evidence to support the same, taken together with that portion of the evidence actually recited, that there was enough to authorize the verdict returned. The petition alleges, in substance, that the plaintiff

was a young and inexperienced boy, employed by the defendant to perform the simple duties of sweeping certain floors and picking up bobbins; that the plaintiff was, by the express direction of his immediate superior, who had authority to direct his movements, instructed to teach a new employee the manner of operating a dangerous machine, known as a lap-winder machine; that in obedience to orders he undertook to manage this machine and to aid the "green" hand in learning how to operate the same, and while so engaged was seriously injured; that, unknown to him, a leaky oil-can had been placed by some one, and allowed to remain, immediately by the machine he was attempting to run, from which oil had exuded or leaked out, rendering the floor at this point very slippery; that in pressing down a pedal in the necessary operation of the machine his foot slipped therefrom, struck the floor made slippery and "slick" by the presence of the oil, and slipped or "went out" from under him, throwing his left hand in between certain rollers on the machine and inflicting the injury complained of.   The plaintiff charged that he never was instructed or warned by the defendant of the hazards and dangers incident to the operation of this machine or of "the presence of the greasy condition of the floor," or of the dangers and risks the oil thereon engendered, and that he did not know of the greasy condition of the floor, and, because of his youth and inexperience, was incapable of appreciating the dangers and hazards to which he was subjected, and, in the exercise of the degree of care and diligence which his mental and physical capacity fitted him to exercise, he could not have known and understood such dangers.   He charged that his injury was caused by the negligence of the defendant in failing to furnish him a safe place to do the work he was directed to do, and in failing to make such inspection of the machinery and place at which he was directed to work as would have discovered the dangers to which he was exposed, and also in failing to warn him of such dangers as existed.   He charged further that the defendant was negligent in permitting the oil to leak upon the floor and thereby exposing him to the dangers arising from its presence.   The evidence, taken as a whole, sufficiently supports all the material allegations, as already said.   It is true the plaintiff himself said: "I don't know how I come to slip my foot—it was so slippery down there; I reckon when I put my foot down there it just slipped out from

under me." "My foot slipped off the pedal. The oil caused me to slip. The pedal was slick, it was the slick that caused my foot to slip." He further admitted that the pedal caused him to slip, but explained that his foot slipped on the pedal, "and then slipped on the floor," and from his testimony it might be clearly deduced that the slipping of his foot from the pedal would not have thrown his hand into the machine and thereby inflicted the injury, but for the fact that after his foot slipped from the pedal it further slipped on the greasy floor and slipped from under him. According to the allegations and the proof, had there been no oil on the floor, there would have been no injury.

Able counsel for the plaintiff in error insist that the presence of the oil on the floor was such an obvious danger as would relieve the master from the duty of warning the servant of the possible dangers that might result therefrom, and that, notwithstanding the fact that the servant in this case was a minor, his evidence clearly demonstrates that he was unusually intelligent and fully capable of understanding without any specific warning this simple danger, and that he had an equal or better opportunity than the master to know of the presence of the oil under and at the side of the machine at the point where he was required to stand in order to properly operate the same. The case of *Roberts* v. *Porter Manufacturing Co.,* 110 *Ga.* 474 (35 S. E. 674), is cited to support the contention that by the use of such care as his capacity fitted him for exercising, the plaintiff could have avoided the injury, and therefore was not entitled to recover. In that case, however, the plaintiff, who was fourteen years old at the time he was hurt, had been working for two years at the same machine that injured him, and when first put to work at the machine he had been instructed by the foreman how to operate it and had been warned "to be careful." In this case there was evidence that the plaintiff had never operated a machine of the kind by which he was injured, and there is no evidence that he was warned by any one of or about the dangers incident to its operation, notwithstanding the witness for the defendant admitted in effect that, while the machine was not more dangerous than other machines in cotton mills, it was, like all cotton machinery, dangerous. Then, too, the injury in this case did not occur from anything dangerous inherent in the machine itself, which the plaintiff might have been intelligent

enough to discover in view of his apparent knowledge, as indicated by his testimony as to the construction and operation of such machines, but the injury resulted, according to the proof, as a direct consequence of the negligence of the defendant in failing to maintain a reasonably safe place for the defendant to perform his work, by allowing oil to accumulate near this machine where it was likely or liable to cause one operating the machine to slip and fall and thus be thrown in contact with the dangerous rollers thereon (as actually occurred in this case), and from its negligence in failing to properly inspect the machine and its surroundings, and in failing to warn the plaintiff of the added danger and hazard created by the accumulation of oil, the presence of which was known to the defendant or should have been known to it in the exercise of ordinary care. The plaintiff testified distinctly that he did not know the oil was there until after his fall. It is true, Coggins, a witness for the plaintiff, stated that the "oil run all around there, you couldn't help but see it; . . it run out in the walk-way;" but Coggins also said: "The doors are open. It was right there near the door, the machinery was, but it was dark in there. The oil was kinder red oil. You would have to *look down under the machine to see it,* around the edges" (italics ours). And Coggins further said that the oil "was under the machine he [the plaintiff] was working; the oil came around the machine where he had to stand; it was all in there about the pedal." The plaintiff testified that the "oil-can was sitting right on the side of the lever, and [he] did not know it was leaking," and that he did not see the oil before his injury.

Taking all the testimony together, it cannot be said judicially that the presence of the oil was so evident and the danger from its presence so obvious that the plaintiff was charged with the duty of discovering the same in the exercise of such due care as should be expected from one of his age and intelligence. While Coggins said "You couldn't help but see" the oil, it must be remembered that Coggins was not at the time working at this particular machine where the plaintiff was injured, and there is no proof that the plaintiff could have seen the oil from the place where he was required to stand while operating the machine. In fact, the presence of the oil could not have been so plainly obvious, since the defendant's witness Shavers, in charge of this room, who

directed the plaintiff to work at this machine, testified that he "did not see any oil there." He "never looked for any oil and never saw any." Jenkins, the foreman, also testified explicitly: "I did not see any oil on the floor in front of that machine up to it." Plainly the jury were authorized to infer that the presence of the oil on which the plaintiff's foot slipped, under or immediately by the side of the pedal, was not easily to be observed or perhaps not observable at all by a person standing with one foot on this pedal or operating the machine, especially in view of the evidence of Coggins that this machinery, though near the door, was in comparative obscurity, or, as he said, "it was dark in there," and his further testimony, "You would have to look down under the machine to see it, around under the edges." Besides, the jury have believed the testimony of the plaintiff, and not that of Coggins, on this point.

In the view that oil immediately under the pedal from which the right foot of the plaintiff slipped might have been practically concealed from the sight of one operating the machine we are confirmed by the photographs of the machine at which the plaintiff was injured, which are in the record. The general grounds of the motion for a new trial are, in our opinion, without merit.

1. The first ground of the amendment to the motion for a new trial complains of the following instruction to the jury: "The master is bound to exercise ordinary care to provide a safe place and reasonably safe machinery for the use of his servants, the servant exercising due care, in the case of a minor of tender years." The movant insists that its only duty was to use ordinary care and provide a reasonably safe place for its servants to work, and that the court, in stating the duty of the master, erred in failing to qualify the words "safe place" with the word "reasonably;" that the language of the court imposed a greater burden than that fixed by law, and made the defendant an insurer of the safety of the place where the plaintiff worked, in that it required absolute safety. Under the plain provisions of section 3130 of the Civil Code, the master must use ordinary care "in furnishing machinery equal in kind to that in general use, and reasonably safe for all persons who operate it with ordinary care and diligence." As was said in *Betts Co.* v. *Hancock,* 139 *Ga.* 198-206 (77 S. E. 77), "the statute unquestionably has the qualifying word 'reasonably' before

the word 'safe,' and that is the rule." This charge undoubtedly placed upon the defendant a greater burden than that imposed by law, and made the defendant practically an insurer of the safety of the place where the plaintiff was directed to work, and if this had been the sole instruction given the jury on this point, under various decisions of the Supreme Court and of this court, this error would require a new trial. However, further in the charge the court expressly instructed the jury that "the master is bound to use ordinary care and diligence to provide a *reasonably* [italics ours] safe place, and reasonably safe machinery at which his servant is placed to work." It has been several times decided that the harmful effect of an erroneous instruction in specific cases could not be obviated merely by a correct instruction elsewhere upon the same subject, and that the attention of the jury should be specifically called to the previous error, and it should be explicitly and expressly withdrawn. *Western & A. R. Co.* v. *Sellers,* 15 *Ga. App.* 369 (83 S. E. 445). In *Savannah, Florida & Western Railway Co.* v. *Hatcher,* 118 *Ga.* 273 (45 S. E. 239), error was assigned because the court charged sections 2322 and 3830 of the Civil Code of 1895 (sections 2797 and 4426 of the Civil Code of 1910) "in immediate connection with each other, without other explanation as to the classes of cases to which each was applicable, when as a matter of law they should be applied to entirely different and distinct classes of cases." The court said that each of these two sections is very brief and condensed, requiring analysis and explanation in order to be understood by the jury; and that to read the two sections in immediate connection, without explanation, would necessarily be confusing. "To tell the jury that if the plaintiff could have avoided the injury he could not recover, and in the same breath to say that if both parties are at fault the plaintiff's damages may be diminished, is calculated to mislead and confuse them on a point about which they should be most carefully and accurately instructed." The defendant in error contended that this error was cured in a subsequent portion of the charge, but the attention of the jury was not called to what had been previously said, and, since the jury must take the whole charge as the law, the court held that it was not for them "to select one part to the exclusion of another, or to decide whether one part cures or qualifies another, without being instructed so to do by the

judge," and the verdict was set aside. It will be observed that in that case two wholly conflicting rules were laid down in immediate connection with each other and without explanation, and therefore, notwithstanding instructions given later, the jury were left absolutely at sea as to the actual law of the case, in the absence of any specific retraction of the original error. Here, however, there is no such conflict between the two different rules laid down by the court. In the first instance the judge simply omitted the word "reasonably," and further on in his charge, and as his last pronouncement to the jury on this question, he properly added this word and specifically instructed them that the master was only required to exercise ordinary care to furnish a "reasonably" safe place for the servant to work. The last instruction simply added a qualifying word to the original instruction, and naturally impressed upon the minds of the jury that only a "reasonably" safe place was required.

The precise point raised by this assignment of error was passed upon by the Supreme Court in *Betts Company* v. *Hancock,* supra, where the Supreme Court said: "The fifth ground of the motion assigns error in the following instruction to the jury: 'It was the duty of the defendant in this case to have used, in the transaction under investigation, ordinary care and diligence, as I have defined it to you, in furnishing the plaintiff a safe place to work— safe appliances with which to do the work required of him, and in giving him such instructions and warnings in regard to the dangers incident to his position or his work as such ordinary care and prudence would have suggested to be necessary.' Section 3130 of the Civil Code provides that 'The master is bound to exercise ordinary care in the selection of his servants, and not to retain them after knowledge of incompetency; he must use like care in furnishing machinery equal in kind to that in general use, and reasonably safe for all persons who operate it with ordinary care and diligence.' The objection is that the court charged the jury that the master must provide the servant a 'safe' place to work, when the statute only imposes the duty of providing a 'reasonably' safe place to work and 'reasonably' safe appliances. The statute unquestionably has the qualifying word 'reasonably' before the word 'safe,' and that is the rule. In *Pelham Mfg. Co.* v. *Powell,* 6 *Ga. App.* 308 (64 S. E. 1116), it was held: 'A charge which

fails to qualify the care required to be exercised by the master as 'ordinary care,' or to qualify the condition of the place and appliances furnished by the master as that of 'reasonable safety,' but instructs the jury, without qualification, that 'the master is charged with the necessity of furnishing such machinery as will be safe,' incorrectly states the rule of law defining the master's duty, and in effect make him an insurer of the servant's safety.' The charge here complained of is undoubtedly inaccurate, but the court had previously instructed the jury correctly on this subject in substantially the language of the statute. Having already charged them the true rule, we can not say that the court later so misstated it as to confuse or mislead the jury." In the case under consideration, it appears to us, there exists a stronger reason why it would be impossible to say that the inaccuracy in the charge of the court was not sufficiently corrected, since in that case the first statement of the law was correct and the last statement inaccurate, whereas in the case under consideration the first statement was inaccurate and the last statement correct.

For still another reason we think this assignment of error insufficient to require the grant of a new trial. In the case of *Pelham Manufacturing Co.* v. *Powell,* supra, this court held, on this precise question, that the vice of giving the wrong rule in a charge that the master is bound to furnish a "safe" place, instead of a "reasonably" safe place, "is not extracted by the fact that the right rule is also given; because it is impossible to tell which rule the jury accepted" in reaching their verdict; and it was held that the court "must make it plain and clear to the jury that the first instruction was incorrect and is expressly retracted, and that the subsequent statement is correct and is substituted for the incorrect one; and it must appear that the jury could not have been misled or confused by the two inconsistent statements." In the opinion, however, the court said, that "courts frequently, in declaring the rule of diligence applicable to the relation of master and servant, omit either the qualifying words 'ordinary' or 'reasonable' as expressive of the master's duty or the word 'reasonably' as qualifying the condition of safety of the place or appliance. And in cases where the evidence of the master's negligence is clear and convincing, the omission of either the one or the other qualifying word might not be reversible error." It is contended by counsel for the de-

fendant in error that this case comes under the ruling last referred to, and, on the other hand, counsel for the plaintiff in error insist that this ruling would apply only where the evidence *demanded* a verdict in favor of the plaintiff. To this last contention we cannot agree, as we do not so interpret the words quoted from the *Powell* case, supra. It is, of course, possible that the evidence of the master's negligence might be "clear and convincing," and yet no verdict for the plaintiff be demanded by the testimony as a whole. Notwithstanding the "clear and convincing" proof of negligence on the part of the master, or even uncontradicted evidence as to the negligence of the master, it might appear that the plaintiff by the exercise of ordinary care could have avoided the consequences to himself caused by the defendant's negligence, and hence was not entitled to recover. Civil Code, § 4426. In such a case, and in other cases that might be mentioned, a verdict for the plaintiff would not be demanded, notwithstanding "clear and convincing evidence" of the negligence of the master.

In this case it appears, from evidence not directly disputed by any one, that near the machine operated by the plaintiff oil was negligently allowed by the master to accumulate at a point which rendered it extremely dangerous for the plaintiff. The evidence does not show any inspection by the master or any effort on his part, so far as this oil was concerned, to preserve or maintain a reasonably safe place for the servant to work, and the master not only failed to warn the plaintiff, but apparently failed even to discover the presence of the substance which rendered the place of work dangerous and brought about the injury. It is true, as urged by the plaintiff in error, that under the testimony it was the duty of a fellow employee to oil this machine at which the plaintiff was injured, and it is insisted that no recovery can be had for an injury resulting from the negligence of a coemployee. However, there is no evidence that the fellow servant of the plaintiff was guilty of any negligence whatever in carelessly or deliberately spilling oil upon the floor, or that in fact this fellow servant, Coggins, who only the day before had begun to work at that machine, had ever touched the leaking oil-can which indirectly brought about the injury. It was not the duty of Coggins to inspect, and it appears that the master did not inspect. The oil was there, its presence rendered the operation of the machine more dangerous, and

actually produced the injury sued for. Its presence could and should have been discovered by the master if proper inspection had been made, and it appears not only that the oil was not so discovered, but that no warning was given to the plaintiff, who was an immature boy, as to the danger liable to arise from the presence of oil about the pedal used in operating this machine. It also appears by the undisputed testimony, and in fact by the admission of the officer of the defendant company who had control of the plaintiff, that he placed the plaintiff in charge of this machine, which several witnesses testified was dangerous and which he himself admitted was dangerous (with dangerous oil about it), without any word of warning or any instruction whatever in regard to its operation or management.

We think, therefore, that the error complained of in this ground of the motion for a new trial is not, for the reason given in the *Powell* case, supra, sufficient to require the grant of a new trial in this case.

2. There is no merit in the 2d ground of the amendment to the motion for a new trial, which complains that the court instructed the jury as follows: "I charge you further that if there are dangers incident to the employment, unknown to the servant, of which the master knows or ought to know, he must give the servant warning in respect thereto." Immediately following this instruction the court further and in direct connection therewith instructed the jury that "it must also appear that the servant injured did not know and did not have equal means of knowing such fact [that there were dangers incident to the employment], and by the exercise of due care, as applicable to this plaintiff as being a minor of tender years, could not have known thereof."

In the 3d and 4th grounds of the amendment to the motion for a new trial it is alleged that the court erred in charging the jury as follows: "Children under fourteen years of age employed as referred to in this petition are not to be held liable for contributory negligence, except for a failure on their part to exercise that degree of care and diligence which their mental and physical capacity fits them for exercising; nor are they to be considered as having assumed the risk of ordinarily patent, obvious, and known dangers not within the scope of their capacity to appreciate and to avoid. . . A master employing as his servant in a dangerous

occupation a child of tender years owes to such child not only the duty of warning him of the dangers, but also of taking such additional precaution against the child's forgetfulness of warning (if he was of such mental condition), his incapacity to appreciate danger (if he were so incapacitated), and other natural childish tendencies as will reasonably insure his safety." Both of these excerpts are almost in the identical language of *Beck* v. *Standard Cotton Mills*, 1 *Ga. App.* 278 (57 S. E. 998). We do not think the court erred in giving this law in charge, for any of the reasons assigned by the plaintiff in error. The charge was adjusted to the pleadings and to the evidence, and was not subject to the objections urged against it. It is complained that the latter excerpt assumed as a fact that the child was employed in a dangerous occupation, while the defendant contended and showed that he was employed as a sweeper—a perfectly safe occupation even for a child, and that he was warned more than once not to work upon the machine at which he was injured. It is enough to say that while the evidence showed that the defendant was employed as a sweeper, the undisputed evidence also shows that he was directed, in addition to his work as a sweeper, to operate the machine at which he was injured, and there is no evidence to show that this machine was not a dangerous machine, but there was evidence to the contrary. While it is true the evidence for the defendant showed that the plaintiff had been thereafter and before the injury warned not to work at this particular machine, the evidence for the plaintiff denied that any such warning had ever been given. Under the evidence the court was clearly authorized to instruct the jury in reference to the employment by a master of a child of tender years in a dangerous occupation. It was also entirely proper for the court to instruct the jury that a master employing a child of tender years owes to him not only the duty of warning him of the danger, but also the duty of taking such additional precaution against his forgetfulness of warning, etc., as would reasonably insure his safety. Conceding that the testimony shows that the plaintiff was a "bright, smart boy," the presumption of law was that a child of tender years, employed in a dangerous occupation, would need such warning; and while this might be rebutted by proof of the general intelligence of the child, or of his special knowledge and experience in connection with the particular dan-

gers of the employment, still this left a question for the jury which was properly submitted to them by the two excerpts complained of.

There is no error in the charge of the court complained of in the 5th ground of the amendment to the motion for a new trial, instructing the jury that if they believed that the defendant, through its boss, to whose orders the plaintiff was subject, ordered him to operate the machine at which he was injured, or to aid another in operating it, and, acting under these orders, he attempted to operate it as instructed, he would have the right to obey the orders given him, if any such orders were given, and it would be his duty to do so, unless the employment was so obviously and manifestly dangerous that in the exercise of such due care upon his part as his mental and physical capacity would enable him to exercise, he should not undertake to obey such instructions. It is complained that the court erred in failing to qualify this instruction by stating the alternative contended for by the defendant, that even though the plaintiff was put to work by the "second boss," on the machine on the day he was injured, this order was subsequently countermanded and the plaintiff directed to leave the machine and the room in which it was located, and not to return. The next ground of the amendment to the motion for a new trial (6th) insists that the court erred in charging the jury, "If you should find from the evidence that the plaintiff was ordered from the room where he alleges he was hurt and from the machine, and directed by the proper authority of the company to leave the room and not to operate the machine, and over such order and direction, if you find that his mental capacity was such as to enable him to appreciate and understand the order given him and to remember it, the warning, if any, and afterwards he voluntarily returned and attempted to operate the machine upon which he is alleged to have been hurt, and was hurt and injured thereby, then the defendant company could not be—would not be liable." This last excerpt unquestionably put before the jury the main contention of the defendant that the plaintiff had been directed, before he suffered his injury, to cease operating the machine at which he was injured and to leave the room where the same was located, and not to return. The last excerpt quoted is complained of on the ground that the court thereby submitted to the jury the question as to the plaintiff's capacity to appreciate and understand an

order given by a boss to leave the room and not operate a machine. There was no error in this instruction, but it was entirely proper under the pleadings and the evidence.

3.  The 7th ground of the amendment to the motion for a new trial complains that there is a material variance between the allegations of the plaintiff's petition and the proof, in that it appears from the testimony of the plaintiff that the proximate cause of the injury was that his foot slipped off a pedal, and not (as alleged by him) that his foot slipped on an oily floor, when he undertook to seize a lever to raise the roller. We think the discussion of the general grounds of the motion disposes of this special exception. It is true the evidence showed that his foot slipped from a pedal, but it also establishes, to our satisfaction, that the slipping of his foot from the pedal would not have resulted in the injury which followed, except for the presence of the oil on the floor which his foot encountered when it slipped from the pedal, and which the jury found to be the proximate cause of the injury, as alleged.

4.  There was no error in refusing to give the jury the following charge: "I charge you that if you find, from the evidence submitted, that the physical facts as proved show that the injuries received by the plaintiff could not have been received in the manner set out in his petition, he cannot recover." The principle therein referred to was sufficiently covered by the charge as given.

Nor did the court err in refusing to give the requested instructions set out in the 9th and 10th grounds of the amendment to the motion for a new trial. In one, if not both, of the requests the instructions requested were argumentative in form; and besides, the requests were sufficiently covered by the charge given.

5.  Taking the record as a whole, it appears that the case was carefully and correctly tried, with fairness to both of the parties litigant, and no sufficient reason appears why the verdict should be set aside.                              *Judgment affirmed.*